UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TRANSLARITY, INC.,<br><br>Plaintiff,<br><br>v.<br><br>GRAND JUNCTION SEMICONDUCTOR PTE. LTD., *et al*.,<br><br>Defendants. | Case No. 24-cv-02423-SI<br><br>**ORDER GRANTING IN PART DEFENDANTS' MOTION TO COMPEL ARBITRATION AND STAYING REMAINING PROCEEDINGS**<br><br>Re: Dkt. Nos. 51-53, 67 |

On October 25, 2024, the Court held a hearing on several motions filed by defendants Grand Junction Semiconductor PTE, Ltd., Pacific Gate Advisors LLC, Robert Marassa and Huan Wang, as well as Translarity's motion to strike paragraphs 16-18 of Robert Marassa's reply declaration. The Court construes defendants' motion to dismiss for improper venue as a motion to compel arbitration, and so construed, the Court GRANTS the motion as follows: Translarity, Grand Junction, Robert Marassa and Huan Wang (in their capacities as agents for Grand Junction) are compelled to engage in arbitration pursuant to the arbitration agreement. The balance of the case is STAYED pending arbitration. Once the stay is lifted, the Court will set a schedule for motion practice regarding the remaining defendants and claims. The Court DENIES the other pending motions as moot.

**BACKGROUND**

On April 23, 2024, plaintiff Translarity, Inc. filed this lawsuit against defendant Grand Junction Semiconductor PTE, Ltd. ("Grand Junction"), Pacific Gate Advisors LLC ("PGA"), Robert Marassa, Huan Wang, Beijing Zhongyi Fund Management Co. Ltd. ("ZiFund") and Alpha Wealth Global Ltd. ("Alpha"). Translarity is a Delaware corporation engaged in international commerce,

with its principal place of business in Fremont, California. First Amend. Compl. ("FAC") ¶ 1. Grand Junction is a Singapore "private limited company" with a principal place of business in Singapore. *Id.* ¶ 2. PGA is a Delaware limited liability company with its principal place of business in Tennessee. *Id.* ¶ 5. Robert Marassa resides in Tennessee and is the President of PGA and the current CEO of Grand Junction. *Id.* ¶ 6; Marassa Decl. ¶¶ 1-2 (Dkt. No. 52-1). Huan Wang resides in California and is a principal of PGA and director of Grand Junction. FAC ¶¶ 161, 189. ZiFund is a Chinese investment firm, and Alpha is a British Virgins Islands limited liability company operated by ZiFund. *Id.* ¶¶ 3-4.[1]

Translarity is in the business of making probe cards and related products used principally for testing semiconductor devices and for providing services associated with such products. *Id.* ¶ 16. Dr. Dominik Schmidt is the CEO of Translarity and former CEO of Grand Junction. *Id.* ¶ 46; Schmidt Decl. ¶ 30 (Dkt. No. 58-1). In 2020, Translarity engaged PGA to solicit investments for the formation of a joint venture in China to expand Translarity's manufacturing capacity and service in the domestic Chinese market. FAC ¶ 18.

Pursuant to that engagement, in December 2021 Translarity entered into a Joint Venture Agreement with a Chinese investment fund, SSEM, to form Shanghai Carson Semiconductor Co., Ltd. ("Carson"), to develop a probe card manufacturing facility in China ("Carson JV Project"). *Id.* ¶ 19. SSEM is managed by another Chinese company, PDSTI. *Id.* ¶¶ 20, 22.[2] Translarity and PDSTI (through SSEM) were the majority shareholders in Carson. *Id.* ¶ 23. As part of the joint venture agreement, PDSTI demanded an investment by Translarity employees. *Id.* ¶ 24. To fulfill this obligation, Translarity employees contributed $500,000 towards the establishment of Carson via ChipExperts Ltd., a company incorporated under the laws of Hong Kong. *Id.* ¶ 24. Dr. Schmidt was appointed the CEO of Carson, and Translarity CFO Christopher Brown was appointed CFO of

---

[1] Alpha was served with the FAC on August 16, 2024. Dkt. No. 61. On September 6, 2024, the parties filed a stipulation to extend the deadline for Alpha to respond to the FAC until 21 days after the Court rules on the pending motions. *Id.* The docket does not reflect that ZiFund has been served.

[2] SSEM, Carson and PDSTI are not named as defendants in this case.

1   Carson.  Schmidt Decl. ¶¶ 19-20.

2          Due to COVID restrictions, government requirements, construction delays and management
3   disputes, many aspects of the Carson JV Project were delayed, leading to cost overruns.  FAC ¶ 25.
4   In 2022, Translarity, on behalf of Carson, again sought PGA's assistance, this time to solicit
5   additional investors for Carson.  *Id*. ¶ 26.  Failure to secure additional investment for Carson could
6   lead to a total loss of the equity held by Translarity.  *Id*. ¶ 27.  Marassa and Wang steered Translarity
7   away from securing further investments from PDSTI, and directed Translarity to work with
8   defendants ZiFund and Alpha.  *Id*. ¶ 29.  Marassa and Wang told Schmidt and Brown that working
9   with ZiFund and Alpha would guarantee payment of significant back due amounts owed to
10  Translarity, Schmidt, and Brown, and that they would never get paid if they continued to work with
11  PDSTI.  *Id.* ¶¶ 30-31.  Translarity claims that "[i]n hindsight, it appears that Marassa's and Wang's
12  efforts (likely guided by ZiFund and Alpha), were from the beginning calculated to leave Translarity
13  and Carson in precarious and compromised financial circumstances so ZiFund (either directly or
14  through Grand Junction) could buy Carson, Translarity, and/or the remaining valuable parts of
15  Carson and Translarity for pennies on the dollar."  *Id*. ¶ 33.

16         The discussions between PGA (through Marassa and Wang) and Translarity led to the
17  formation in January 2023 of Grand Junction.  *Id*. ¶ 34; Marassa Reply Decl. ¶ 7, Ex. 1 (Dkt. No.
18  64-1).[3]  Alpha was the principal investor in Grand Junction.  FAC ¶ 37.  Grand Junction was formed
19  to invest in or acquire Carson, and Translarity alleges that "Grand Junction's acquisition of Carson
20  was the core feature of the transactions and proposed transactions giving rise to this litigation."  *Id.*
21  ¶¶ 34, 39.  Translarity alleges that Grand Junction "was based on the vision of Dr. Dominik Schmidt
22  . . . who was the only member of Grand Junction's initial management team with any background
23  in the semiconductor field."  *Id*. ¶ 35.  Schmidt's vision "was to develop a vertically integrated
24  semiconductor test business that would ultimately include Carson and a number of related

---

[3] The FAC, Dr. Schmidt's declaration, and some of the briefs state that Grand Junction was formed in late 2022.  Marassa filed a reply declaration stating that Grand Junction's formation records, which he filed as Exhibit 1 to that declaration, show that Grand Junction was formed on January 5, 2023.  Translarity does not object to this portion of Marassa's reply declaration.

businesses and utilize services from Translarity." *Id*. ¶ 36.

In conjunction with the formation of Grand Junction, Marassa, Wang, Schmidt and others "loosely but firmly agreed to a plan for Translarity to assist Grand Junction in acquiring several strategic companies in this space" and the acquired companies "would benefit Translarity, Carson, and Grand Junction upon Grand Junction's planned acquisition of Carson." *Id*. ¶ 40. Schmidt and Brown worked on these acquisition efforts, and Translarity alleges that these efforts were on behalf of Grand Junction and that Translarity's employees were never paid by Grand Junction for their work, while Grand Junction asserts that Schmidt took these actions on behalf of and for the benefit of Translarity, not Grand Junction. FAC ¶¶ 44-47; Marassa Reply Decl. ¶ 15.

Schmidt was hired "with a signed agreement" to be Grand Junction's CEO. FAC ¶ 46.[4] Schmidt was the CEO of Grand Junction until he was "removed" from that position in February 2024. Schmidt Decl. ¶ 34. Marassa is the current CEO of Grand Junction. Marassa Decl. ¶ 1.

In early 2023, Translarity, Carson and PDSTI (the majority shareholder in Carson) entered into negotiations with Grand Junction for Grand Junction to acquire Carson. FAC ¶ 49. In September 2023, "Grand Junction walked away from the initial negotiations, stating among other things in a meeting with Translarity and PDSTI, that 'Translarity must die.'" *Id*. ¶ 57. After this meeting, Schmidt and Brown were stripped of their positions with Carson (CEO and CFO, respectively), and Translarity was "locked out" of Carson. *Id*. ¶ 58. In October 2023, "after waiting a month in the apparent hope that Translarity would suffer financial harm and acquiesce to Grand Junction's demands, the parties resumed bona fide negotiations." *Id*. ¶ 61.

In February 2024, Translarity, Carson and Grand Junction "formally and unequivocally" agreed to a negotiated transaction by signing a Share Purchase Agreement ("SPA") and Subscription Agreement ("SSA"). *Id* ¶ 64; Marassa Decl. Ex. A (SPA), Ex. B (SSA).[5] The SPA provided that,

---

[4] At the hearing on defendants' motions, Translarity's counsel stated that Dr. Schmidt was Grand Junction's CEO from its formation in January 2023 until February or March of 2024. As discussed *infra*, many of Translarity's allegations relate to actions taken by Grand Junction during the time that Dr. Schmidt was CEO—such as Grand Junction walking away from negotiations with Translarity in September 2023—and it is unclear who at Grand Junction took these actions and whether Dr. Schmidt was involved in his role as Grand Junction's CEO.

[5] The FAC's first cause of action alleges breach of the SPA. Although the first cause of

4

subject to specified conditions, Grand Junction would make an investment in Carson and acquire Translarity's stock in Carson. FAC ¶¶ 63-64. The SSA provided that, subject to specified conditions, Translarity would acquire equity in Grand Junction. *Id*. ¶ 64. Marassa signed the SPA and SSA on behalf of Grand Junction (as a "Director") and Schmidt signed the SPA and SSA on behalf of Translarity (as President).

The SPA and SSA contain nearly identical arbitration provisions. The SPA provides, in relevant part,

> 11.1  Arbitration
>
> 11.1.1  In the event of any dispute, controversy, difference, conflict or claim arising out of or in connection with this Agreement, including any question regarding its existence, validity, termination or a claim for unlawful act under the applicable Laws (the "Dispute"), the Parties agree to attempt, for a period of 30 calendar days after the receipt by a Party of a written notice from the other Party of the existence of the Dispute ("Settlement Period"), to settle the Dispute by amicable settlement between the Parties.
>
> 11.1.2  In the event the Dispute cannot be settled by an amicable settlement within the Settlement Period, any Party may, by written notice to the other Parties, refer such Dispute to be finally settled by arbitration administered by the Singapore International Arbitration Centre ("SIAC") under the Arbitration Rules of the SIAC (the "SIAC Rules") for the time being in force, which rules are deemed to be incorporated by reference in this Section 11.1.2. The seat and place of the arbitration shall be Singapore. This arbitration agreement shall be governed by the Laws of Singapore. The tribunal shall consist of a single arbitrator to be appointed by the President of the SIAC in accordance with the SIAC Rules. The language of the arbitration shall be English. The decision of the arbitrator shall be final and binding upon the Parties. Notwithstanding the provisions of Section 11.7, any notice of arbitration, response, or other communication given to or by a Party to the arbitration must be given and deemed received in accordance with SIAC Rules.[6]
>
> 11.1.3. Nothing in this Section shall preclude any Party from applying for urgent interlocutory relief from any court of competent jurisdiction, and for this purpose, the Parties expressly submit to the non-exclusive jurisdiction of the Court.

Marassa Decl. Ex. A ¶ 11.1

By early March 2024, Translarity, Carson and Grand Junction had "addressed the checklist of items necessary to carry out the Closing (as defined in the Share Purchase Agreement) and were therefore in all material respects ready and able to close." FAC ¶ 68. Translarity claims that closing

---

action is titled "Breach of Contract- Share Purchase Agreement, Subscription Agreement," the allegations under that cause of action relate solely to the SPA, not the SSA.

[6] Section 11.7 discusses how to provide notice.

5

should have occurred on March 11, 2024, but that Grand Junction delayed by providing "bogus excuses" and being non-responsive until April 1, 2024, when Grand Junction informed Carson and Translarity that the closing was off. *Id*. ¶¶ 70-74. On April 3, 2024, Translarity sent Grand Junction, Marassa, Wang and Carson a "Notice of Dispute" pursuant to the Section 11.1.1 of the SPA and the corresponding provision of the SSA. Marassa Decl. Ex. C. On April 14, 2024, Grand Junction provided a written "Response to Notice of Dispute" to Translarity. *Id*. Ex. D. In that letter, Grand Junction disagreed with Translarity's description of the facts and referred Translarity to a February 9, 2024 Capital Increase Agreement between Carson and Grand Junction. *Id*. at 2. Grand Junction stated that there was a "close interrelationship" between the Capital Increase Agreement, the SPA and the SSA, and Grand Junction stated, *inter alia*,

> 7. In parallel with the closing preparation work under the SPA and SSA, we were continuously evaluating situations at Carson and fulfilment of closing conditions under the Capital Increase Agreement. In early March, certain developments at Carson after execution of the Capital Increase Agreement had come into our attention, including, but not limited to, (i) notice from certain suppliers and contractors of Carson that they were preparing and were ready to bring up legal actions against Carson in connection with unpaid bills owed by Carson, (ii) update that landlord of Carson's factory in Suzhou had brought up legal actions against Carson in connection with unsettled rent payments and breach of lease agreement, (iii) departure of certain employees of Carson and legal actions against Carson that were brought up by certain employees, and (iv) update that Carson completely ceased activities of manufacturing, research and developments and its daily operations (collectively, "Post-Signing Matters"). In light of all such Post-Signing Matters, we have taken the view that certain representations and warranties that Carson is required to give to us at the closing of the transactions contemplated under the Capital Increase Agreement would be untrue, inaccurate and incomplete and therefore the condition precedent to our obligations to close the transactions contemplated under the Capital Increase Agreement set forth in Section 3(1) therein would be not be [sic] fulfilled. In addition, we are not willing to waive such key condition precedent. As a result, the transactions contemplated under the Capital Increase Agreement cannot be consummated. On March 30, 2024, we sent an update notice to Carson indicating our view. We enclose such update notice in Annex A.
>
> 8. Stemming from this, as the condition precedent set out under Section 8.1.8 of the SPA, viz., that "[t]he investment of US$10,000,000 by the Purchaser in the Company shall have been consummated pursuant to the Capital Increase Agreement at the Closing", will not be fulfilled and we are not willing to waive such key condition precedent, the Closing of the SPA (including, but not limited to, sale of the Carson shares held by Translarity) cannot take place. We want to emphasize that, contrary to your claim in the Notice, with the failure of such key condition precedent, we have no obligation to consummate the Closing under the SPA.

*Id*. at 2-3.

Translarity filed this lawsuit on April 23, 2024, and filed the FAC on June 7, 2024. The

6

FAC alleges nine causes of action: (1) breach of contract based on the SPA against Grand Junction; (2) breach of implied non-solicit agreement against Grand Junction; (3) misappropriation of trade secrets under the federal Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.* against Grand Junction; (4) misappropriation of trade secrets under the California Uniform Trade Secrets Act, Cal. Civ. Code § 3426 *et seq.* against Grand Junction; (5) fraud against Grand Junction, PGA, Marassa and Wang; (6) fraud, racketeering and wire fraud under RICO, 18 U.S.C. §§ 1961, 1962 & 1964 against ZiFund, Alpha, Marassa and Wang; (7) breach of fiduciary duty and duty of loyalty against PGA, Marassa and Wang; (8) unjust enrichment against Grand Junction; and (9) tortious interference with contractual relations against Grand Junction, ZiFund, Alpha, Marassa and Wang.

On July 23, 2024, specially appearing defendants Grand Junction, PGA, Marassa and Wang filed three motions: (1) motion to dismiss for improper venue and to stay remaining proceedings based on the SPA's arbitration provision;[7] (2) motion to dismiss for lack of personal jurisdiction; and (3) motion to dismiss certain causes of action for failure to state a claim.

## LEGAL STANDARD

Section 4 of the Federal Arbitration Act ("FAA") permits "a party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration [to] petition any United States District Court . . . for an order directing that . . . arbitration proceed in the manner provided for in [the arbitration] agreement." 9 U.S.C. § 4. Upon a showing that a party has failed to comply with a valid arbitration agreement, the district court must issue an order compelling arbitration. *Id*.

International commercial arbitration agreements involving a United States corporation are governed by Chapter 2 of the FAA, which codifies the United Nations Convention on the

---

[7] Defendants' motion to dismiss for improper venue and to stay remaining proceedings initially asserted that Translarity is required to arbitrate its claims but that this Court lacked the authority to compel arbitration in Singapore. The Court directed supplemental briefing on whether the SPA falls within the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 9 U.S.C. §§ 201 et seq., because a district court may compel arbitration in a foreign location if the proposed arbitration is governed by the Convention. 9 U.S.C. § 206. Defendants' supplemental brief states that the SPA is covered by the Convention and requests that the Court compel arbitration in Singapore.

7

Recognition and Enforcement of Foreign Arbitral Awards (the "New York Convention" or "Convention"). 9 U.S.C. § 206. A district court may compel arbitration not only in its own district but also in a foreign location if the proposed arbitration is governed by the Convention. *Id*. Arbitration agreements governed by the New York Convention are also governed by Chapter 1 of the FAA to the extent that the FAA and the Convention are not in conflict. 9 U.S.C. § 208.

"There is generally a 'liberal federal policy favoring arbitration agreements.'" *Oracle America, Inc. v. Myriad Group A.G.*, 724 F.3d 1069, 1072 (9th Cir. 2013) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)). "In accordance with that policy, 'doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration.'" *Id*. (quoting *Moses H. Cone*, 460 U.S. at 24-25). The strong federal policy in favor of arbitration applies "with special force in the field of international commerce." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 631 (1985); *Republic of Nicaragua v. Standard Fruit Co.*, 937 F.2d 469, 478 (9th Cir. 1991) ("[W]hen international companies commit themselves to arbitrate a dispute, they are in effect attempting to guarantee a forum for any disputes. Such agreements merit great deference, since they operate as both choice-of-forum and choice-of-law provisions, and offer stability and predictability regardless of the vagaries of local law.").

## DISCUSSION

Defendants seek to compel arbitration in Singapore pursuant to the arbitration provision in the SPA. Defendants contend that the SPA is governed by the Convention and that the broad arbitration provision encompasses all of Translarity's claims. Defendants also argue that because the arbitration provision incorporates the rules of the Singapore International Arbitration Centre, the arbitrator should decide questions of arbitrability. Finally, defendants argue that Marassa, Wang and PGA may invoke the arbitration clause because they have a close relationship with Translarity and Grand Junction and the claims against them are intertwined with the underlying contractual obligations in the SPA.

Translarity concedes that the SPA is governed by the Convention, but that asserts that the arbitration provision only covers the first cause of action for breach of the SPA. However,

8

Translarity contends that it cannot be compelled to arbitrate because the SPA was procured by fraud. Translarity also argues that Marassa, Wang and PGA may not invoke the arbitration agreement because they are not parties to the SPA and Translarity's claims against these defendants do not rely on the terms of the SPA. Finally, Translarity argues that the Court, not the arbitrator, should decide questions of arbitrability.

### I.   Applicability of the Convention

"Article II of the Convention imposes a mandatory duty on the courts of a Contracting State to recognize, and enforce an agreement to arbitrate unless the agreement is 'null and void, inoperative or incapable of being performed.'" *Riley v. Kingsley Underwriting Agencies, Ltd.*, 969 F.2d 953, 959 (10th Cir. 1992) (quoting 9 U.S.C. § 201 note, art. II(3)). "When asked to enforce an agreement under the Convention, the Court performs a 'very limited inquiry' to decide the following four questions (hereinafter referred to as the '*Riley* factors'):

(1) Is there an agreement in writing to arbitrate the subject of the dispute?

(2) Does the agreement provide for arbitration in the territory of the signatory of the Convention?

(3) Does the agreement arise out of a legal relationship whether contractual or not, which is considered as commercial?

(4) Is a party to the agreement not an American citizen, or does the commercial relationship have some reasonable relation with one or more foreign states?"

*Prograph Intern. Inc. v. Barhydt*, 928 F. Supp. 983, 988 (N.D. Cal. 1996). "'If these questions are answered in the affirmative, a court is required to order arbitration' unless the court finds the agreement to be null and void, inoperative, or incapable of being performed." *Id.* (quoting *Riley*, 969 F.2d at 959).

The Court concludes that the SPA is governed by the Convention. As to the first factor, the SPA is an agreement in writing that contains an arbitration provision. When deciding whether a dispute is arbitrable, the Court applies federal arbitrability law unless the parties have agreed to have arbitrability governed by a different law. *See Cape Flattery Ltd. v. Titan Maritime, LLC*, 647 F.3d 914, 918-19 (9th Cir. 2011). The Ninth Circuit has held that there must be "clear and unmistakable

evidence" that the parties intended non-federal arbitrability law to determine whether a given dispute is arbitrable in the first place, and that a choice-of-law provision does not necessarily constitute such evidence. *See id.* at 920 ("The arbitration provision states that '[a]ny dispute arising under this Agreement shall be settled by arbitration in London, England, in accordance with the English Arbitration Act 1996 and any amendments thereto, English law and practice to apply.' Under this provision, English arbitration law clearly applies to disputes that are subject to arbitration, and English law and practice are to be applied by the arbitrator. However, the agreement is ambiguous concerning whether English law also applies to determine whether a given dispute is arbitrable in the first place. Faced with such ambiguity, we conclude that federal law applies to determine arbitrability.").

The parties did not brief the question of whether federal arbitrability law or Singapore law applies[8] to resolve the question of whether the parties agreed to arbitrate their dispute. The Court finds it unnecessary to resolve this question because under either law the result is the same. The SPA's arbitration provision broadly applies to "any dispute, controversy, difference, conflict or claim arising out of or in connection with this Agreement." Courts applying federal arbitrability law have held that that "the language 'arising in connection with' reaches every dispute between the parties having a significant relationship to the contract and all disputes having their origin or genesis in the contract." *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 721 (9th Cir. 1999); *see also Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1131 (9th Cir. 2000) (holding contract dispute was covered by arbitration agreement where "[t]he parties' arbitration clause is broad and far reaching: 'Any dispute, controversy or claim arising out of or relating to . . . this Agreement'" and "the current dispute centers on whether Ortho violated certain provisions of the joint agreement or the implied covenant of good faith and fair dealing by allegedly refusing to consider the proposed amendment"). As to Singapore law, "[m]any principles of contract interpretation under Singapore law will be familiar to legal practitioners in California," and under Singapore contract law, "[w]here the text is 'plain and unambiguous inasmuch as it admits of one clear meaning,' and 'there is nothing

---

[8] The SPA provides that the "arbitration agreement shall be governed by the Laws of Singapore." SPA ¶ 11.1.2.

. . . in the context which militates against what is the plain language of the text itself,' the unambiguous meaning controls." *Saw v. Avago Techs. Ltd.*, 51 Cal. App. 5th 1102, 1109 (2020) (quoting and applying Singapore contract law).

The plain language of the SPA's arbitration provision covers, at a minimum, Translarity's first cause of action for breach of the SPA.[9] Translarity alleges that Grand Junction breached the SPA by failing to carry out the closing by which Grand Junction would make a substantial investment in Carson and acquire Translarity's stock in Carson. Resolving this claim would require analysis of the SPA and the evidence relating to the alleged breach, as well as of Grand Junction's contention that it was not obligated to close the transaction because conditions precedent were not satisfied. Indeed, Translarity concedes that the first cause of action is a "dispute" "arising out of or in connection with" the SPA, though it raises other defenses to enforcement of the arbitration provision. The Court concludes that the broad language of the arbitration provision embraces Translarity's first cause of action for breach of the SPA.

The Court is also unpersuaded by Translarity's argument, made for the first time at the hearing, that the arbitration provision's use of the word "may" means that arbitration is optional. Paragraph 11.1.2 states that "In the event that the Dispute cannot be settled by an amicable settlement within the Settlement Period, any Party may, by written notice to the Other Parties, refer such Dispute to be finally settled by arbitration administered by the [SIAC] . . . ." SPA ¶ 11.1.2. The Court agrees with the reasoning of *Entravision Commc'ns Corp. v. BroadView Software, Inc.*, Case No. CV 09-4573-GHK (AJWx), 2009 WL 10675885, at *2 (C.D. Cal. Aug. 26, 2009), in which the court granted a motion to compel arbitration and rejected an argument similar to that raised by Translarity. *See id.* (applying California contract law and holding that arbitration provision stating that "either party may refer such Dispute to binding arbitration" "requires arbitration once it is initiated by a Party . . . [because] [t]he word 'may' is used in the context of an initial referral to arbitration, not in the context of agreeing to arbitrate once a party has elected arbitration.").

The remaining *Riley* factors are also satisfied. The SPA provides for arbitration in

---

[9] The Court discusses whether the arbitration agreement encompasses Translarity's other causes of action in Section III *infra*.

11

Singapore, which is a signatory of the Convention.[10] Finally, the SPA is a commercial contract between Translarity and Grand Junction, a Singapore company.

## II.     Fraud Defense to Enforcement of Arbitration Provision

Translarity contends that the SPA's arbitration provision is null and void because the SPA was procured by fraud. Translarity cites the FAC at paragraphs 155-65, which are the allegations in support of the fifth cause of action for fraud. In that cause of action, Translarity alleges that Grand Junction, Marassa, Wang and PGA "knowingly manipulated Translarity for over a year by making repeated communications intended to lead Translarity into believing that Grand Junction had a good faith intent and was making a good faith effort to negotiate, execute and carry out a transaction like the transaction associated with the [SPA]" while in actuality they "had no intent—or at best limited intent—to actually enter into and/or actually perform this transaction." FAC ¶¶ 156-57. Translarity argues that defendants fraudulently induced it to enter into the SPA, and thus that the SPA, and its arbitration provision, are voidable.

Translarity's arguments lack merit. "[U]nless the challenge is to the arbitration clause itself, the issue of the contract's validity is considered by the arbitrator in the first instance." *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 445-46 (2006); *see also Prima Paint v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404 (1967) (where fraud does not go to the arbitration clause itself, arbitration clause is enforceable and arbitrator resolves claim of fraudulent inducement of contract). Here, even if the fifth cause of action can be construed to allege fraud in the inducement of the SPA,[11] the FAC does not allege any fraud specific to the inclusion of the arbitration provision. Thus, the SPA's arbitration provision is enforceable.

---

[10] *See* https://www.newyorkconvention.org/contractingstates (showing Singapore acceded to the Convention on August 21, 1986).

[11] Translarity does not seek to void the SPA. To the contrary, Translarity's breach of contract claim is premised on the validity of the SPA, and Translarity seeks money damages as a result of the breach, or in the alternative, specific performance of the SPA. FAC Prayer for Relief.

12

### III. Scope of Arbitration

The parties dispute whether the arbitration provision applies to all of Translarity's causes of action against Grand Junction, and relatedly whether the Court or the arbitrator decides this question. "Just as the arbitrability of the merits of a dispute depends upon whether the parties agreed to arbitrate that dispute, so the question 'who has the primary power to decide arbitrability' turns upon what the parties agreed about that matter." *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 943 (1995) (internal citations omitted). "[U]nlike the arbitrability of claims in general, whether the court or the arbitrator decides arbitrability is 'an issue for judicial determination unless the parties clearly and unmistakably provide otherwise.'" *Oracle America, Inc. v. Myriad Group A.G.*, 724 F.3d 1069, 1072 (9th Cir. 2013) (quoting *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002)).

In *Oracle America*, the Ninth Circuit held that "as long as an arbitration agreement is between sophisticated parties to commercial contracts," the incorporation of the United Nations Commission on International Trade Law (UNCITRAL) arbitration rules into an arbitration provision in a commercial contract constitutes clear and unmistakable evidence that the parties to the contract intended to delegate questions of arbitrability to the arbitrator. *Id.* at 1075. The Ninth Circuit reasoned that "[b]y giving the arbitral tribunal the authority to decide its own jurisdiction, both the 1976 and 2010 UNCITRAL rules vest the arbitrator with the apparent authority to decide questions of arbitrability." *Id.* at 1073.[12] The court noted that virtually every other circuit had concluded that the incorporation of the American Arbitration Association's (AAA) arbitration rules constituted clear and unmistakable evidence that the parties agreed to arbitrate arbitrability, and that the AAA rules contain a jurisdictional provision "similar" to the 1976 UNCITRAL rules and "almost identical" to the 2010 UNCITRAL rules. *Id.* at 1074.

Defendants contend that the SIAC rules incorporated in the SPA's arbitration provision are almost identical to the UNCITRAL rules considered in *Oracle America*, and thus under *Oracle*

---

[12] The Ninth Circuit considered both versions of the UNCITRAL rules, and found that it was unnecessary to decide which version applied. The 1976 UNCITRAL arbitration rules provided that "[t]he arbitral tribunal shall have the power to rule on objections that it has no jurisdiction, including any objections with respect to the existence or validity of the arbitration clause or of the separate arbitration agreement," while the 2010 UNCITRAL rules stated that "[t]he arbitral tribunal shall have the power to rule on its own jurisdiction, including any objections with respect to the existence or validity of the arbitration agreement." *Id.*

13

1  *America* the Court should hold that the parties agreed to arbitrate arbitrability. SIAC Arbitration
2  Rule 28.2 provides that the SIAC "shall have the power to rule on its own jurisdiction, including
3  any objections with respect to the existence, validity or scope of the arbitration agreement." SIAC
4  Arbitration Rules (6th ed., Aug. 1, 2016), found at https://siac.org.sg/siac-rules-2016. Defendants
5  assert that Translarity and Grand Junction are "sophisticated parties" to a commercial contract (the
6  SPA), and they note that at least one other court has held that "incorporating the SIAC rules
7  delegates arbitrability questions to the arbitrator" and thus "the scope of the arbitration agreement
8  is a question for the arbitrator and is not appropriate for this Court to consider." *SolarPark Korea
9  Co. v. Solaria Corp.*, No. 23-CV-01181-AMO, 2023 WL 4983159, at *15 (N.D. Cal. Aug. 2, 2023),
10 appeal dismissed, No. 23-16150, 2023 WL 9860831 (9th Cir. Sept. 28, 2023).

11  In response, Translarity contends that the SIAC rules do not make the SIAC the exclusive
12 adjudicator of arbitrability, and thus that the Court has the authority to decide arbitrability.
13 Translarity relies on *Mondragon v. Sunrun Inc.*, 101 Cal. App. 5th 592 (2024). In that case, an
14 employer required an hourly employee to sign an arbitration agreement as a condition of
15 employment. *Id*. at 599. The California Court of Appeal held that the parties did not delegate
16 arbitrability decisions to the arbitrator because "by signing an arbitration agreement that (1) merely
17 referred to the rules of the American Arbitration Association; (2) included a carve-out that arguably
18 covered the dispute; and (3) included a severability clause stating a court may not enforce certain
19 provisions, Mondragon, an unsophisticated party, did not delegate arbitrability decisions to the
20 arbitrator." *Id*. In reaching its decision, the court repeatedly emphasized that Mondragon was an
21 unsophisticated party. *See id.* at 604-07. *Mondragon* is distinguishable from this case because
22 Translarity does not dispute that it is a sophisticated party and the SPA does not contain any carve-
23 out covering this dispute.

24  The Court agrees with *SolarPark Korea Company* and concludes that under the reasoning
25 of *Oracle America*, the incorporation of the SIAC rules in the SPA's arbitration provision constitutes
26 clear and unmistakable evidence that the parties to the contract intended to delegate questions of
27 arbitrability to the arbitrator. SIAC Rule 28.2 is almost identical to the 2010 UNCITRAL rule.
28 Translarity and Grand Junction are sophisticated parties who entered into a commercial contract,

14

1  and they "shall be expected to understand that incorporation of the [SIAC] rules delegates questions
2  of arbitrability to the arbitrator." *Oracle Am., Inc.*, 724 F.3d at 1075. As such, the Court does not
3  address the parties' arguments about whether Translarity's other causes of action against Grand
4  Junction (the second-fifth and eighth-ninth causes of action) are covered by the arbitration
5  agreement, as that is a question to be determined by the arbitrator.

**IV.    Marassa, Wang and PGA**

Finally, the parties dispute whether Marassa, Wang and PGA, as nonsignatories to the SPA, can invoke the SPA's arbitration provision to compel Translarity to arbitrate its claims against them.[13] "In cases involving the New York Convention, in determining the arbitrability of federal claims by or against non-signatories to an arbitration agreement, we apply 'federal substantive law,' for which we look to 'ordinary contract and agency principles.'" *Setty v. Shrinivas Sugandhalaya LLP*, 3 F.4th 1166, 1168 (9th Cir. 2021); *see also Mundi v. Union Sec. Life Ins. Co.*, 555 F.3d 1042, 1045 (9th Cir. 2009) ("General contract and agency principles apply in determining the enforcement of an arbitration agreement by or against nonsignatories.") (citing *Comer v. Micor, Inc.*, 436 F.3d 1098, 1101 (9th Cir. 2006)). "[C]ourts have generally found . . . [that] arbitration is more likely to be attained when the party resisting arbitration is a signatory." *Amisil Holdings Ltd. v. Clarium Cap. Mgmt.*, 622 F. Supp. 2d 825, 831 (N.D. Cal. 2007) (discussing cases).

Defendants contend that Marassa and Wang can enforce the SPA as agents of Grand Junction, and that PGA can enforce the SPA because of its close relationship to Translarity and Grand Junction and the claims against it are intertwined with the underlying contractual obligations.

**A.    Agency – Marassa and Wang**

"[A]gents of a signatory can compel the other signatory to arbitrate so long as (1) the wrongful acts of the agents for which they are sued relate to their behavior as agents or in their

---

[13] Translarity alleges claims for fraud against Marassa, Wang and PGA (fifth cause of action); against Marassa and Wang for RICO (sixth cause of action); breach of fiduciary duty and duty of loyalty against Marassa, Wang and PGA (seventh cause of action); and tortious interference with contractual relations against Marassa, Wang and PGA (ninth cause of action).

15

capacities as agents (*Letizia*) and (2) the claims against the agents arise out of or relate to the contract containing the arbitration clause (*Britton*) (consistent with the language of the arbitration clause)." *Amisil Holdings Ltd.*, 622 F. Supp. 2d at 832 (citing and discussing *Letizia v. Prudential Bache Secs., Inc.*, 802 F.2d 1185 (9th Cir. 1986), and *Britton v. Co-op Banking Group*, 4 F.3d 742 (9th Cir. 1993)).

Here, Marassa and Wang are agents of Grand Junction. The FAC alleges that Marassa and Wang are "principals" of Grand Junction, and Marassa signed the SPA on behalf of Grand Junction. Translarity's claims against Marassa and Wang relate to their behavior, at least in large part, as agents for Grand Junction. Translarity's fraud cause of action alleges that Marassa and Wang (along with Grand Junction and PGA) "knowingly manipulated Translarity for over a year by making repeated communications intended to lead Translarity into believing that Grand Junction had a good faith intent and was making a good faith effort to negotiate, execute, and carry out a transaction like the transaction associated with the Share Purchase Agreement," and the FAC alleges that Marassa and Wang sent numerous texts, emails and phone calls "on behalf of Grand Junction" to perpetuate this fraud. FAC ¶¶ 156-61. Similarly, Translarity's RICO, breach of fiduciary duty, and tortious interference with contractual relations claims are also based at least in part on their actions as agents for Grand Junction. *See e.g. id.* ¶ 170 (RICO) ("Marassa and Wang used Grand Junction as a vehicle to harm Translarity in an attempt to convert its confidential information and 'kill' and therefore control Translarity. This was done using a legitimate Share Purchase Agreement under which . . . Marassa and Wang never had any intent to close."); ¶ 194 (breach of fiduciary duty) ("Marassa and Wang further leveraged their relationship with ZiFund, under the guise of establishing Grand Junction and therefore soliciting investment, to induce Translarity and Translarity staff to perform acts and provide services that inured to the benefit of Grand Junction, PGA and themselves individually"); ¶ 215 (tortious interference) ("In or around September 2023, Grand Junction (through Marassa and Wang as its agents) . . . and Marassa and Wang induced PDTSI to lock Dr. Schmidt and Christopher Brown out of Carson by communicating to PDTSI that Dr. Schmidt and Christopher Brown were the reason a deal with Grand Junction could not be agreed to and consummated.").

In addition, the claims against Marassa and Wang relate to the SPA, consistent with the broad language of the SPA's arbitration provision. The SPA requires arbitration of "any dispute, controversy, difference, conflict or claim arising out of or in connection with this Agreement . . . ." SPA ¶ 11.1.1. Translarity's fraud claim is "connected" to the SPA because Translarity alleges that Marassa and Wang "knowingly manipulated Translarity . . . into believing that Grand Junction had a good faith intent and was making a good faith effort to negotiate, execute, and carry out a transaction like the transaction associated with the Share Purchase Agreement" while they "had no intent—or at best limited intent—to actually enter into and/or actually perform this transaction." FAC ¶¶ 156-57. Translarity's RICO claim is "connected" to the SPA because the FAC alleges that Marassa and Wang used Grand Junction and the SPA specifically as a means to harm, "kill," and control Translarity. *Id.* ¶¶ 170-71. Translarity's breach of fiduciary duty claim is "connected" to the SPA because the FAC alleges that Marassa and Wang breached their duties by, *inter alia*, "orchestrating . . . the collapse of multiple efforts to secure investment for Carson, including the transaction associated with the signed Share Purchase Agreement . . . ." *Id* ¶ 199. Similarly, Translarity's tortious interference claim is "connected" to the SPA because Translarity alleges that Marassa and Wang, on behalf of Grand Junction, communicated to PDSTI that Schmidt and Brown were the reason a deal with Grand Junction could not be agreed to and consummated, and this representation was false and designed "to exact more favorable transaction terms from Translarity" – transaction terms that were later agreed to in the SPA. *Id*. ¶ 216; *see also id*. ¶¶ 57-64. In addition, the fraud, RICO and breach of fiduciary duty causes of action each seek as relief "[o]ver $600,000 in attorney fees to advise on, negotiate, and prepare documents for the transaction"—namely, the transaction contemplated by the SPA. *Id*. ¶¶ 166, 187, 203.

Accordingly, the Court concludes that under agency principles, to the extent Translarity alleges claims against Marassa and Wang based upon the actions that they took on behalf of Grand Junction, those claims should be arbitrated. To the extent that Translarity brings claims against Marassa and Wang *in their capacity as employees* of PGA, the Court finds that those claims are not subject to arbitration. However, because those claims are intertwined with the arbitrable claims, the Court finds that it is in the interest of judicial efficiency to STAY the litigation of the non-arbitrable

17

claims pending the resolution of the arbitration. *See Moses H. Cone Hosp.*, 460 U.S. at 20 n. 23 ("[I]t may be advisable to stay litigation among the nonarbitrating parties pending the outcome of the arbitration. That decision is one left to the district court (or to the state trial court under applicable state procedural rules) as a matter of its discretion to control its docket."); *see also Hill v. GE Power Systems, Inc.*, 282 F.3d 343, 347 (5th Cir. 2002). ("[I]f a suit against a nonsignatory is based upon the same operative facts and is inherently inseparable from the claims against a signatory, the trial court has discretion to grant a stay if the suit would undermine the arbitration proceedings and thwart the federal policy in favor of arbitration.").

### B. Alternative Estoppel - PGA

Defendants do not articulate the precise theory under which PGA seeks to invoke the SPA's arbitration provision, though defendants assert that PGA has a close relationship with the parties and that Translarity's claims against PGA are intertwined with the SPA. Defs' Mtn. at 11 (citing *Thomson-CSF, S.A. v. Am. Arb. Ass'n*, 64 F.3d 773, 779 (2d Cir. 1995) (discussing alternative equitable estoppel). In *Thomson-CSF*, the Second Circuit noted that courts had recognized an "alternative equitable estoppel" theory requiring arbitration between a nonsignatory and a signatory when "because of the close relationship between the entities involved, as well as the relationship of the alleged wrongs to the nonsignatory's obligations and duties in the contract . . . and [the fact that] the claims were intimately founded in and intertwined with the underlying contract obligations." *Id*.

The Court declines to apply alternative estoppel because, while there is a close relationship between the entities, PGA does not have any "obligations and duties" imposed by the SPA. However, because the claims against PGA are closely related to the arbitrable claims and parties to the arbitration, the Court STAYS those claims pending the arbitration. *See Moses H. Cone Hosp.*, 460 U.S. at 20 n. 23; *Hill v. GE Power Systems, Inc.*, 282 F.3d at 347.

### CONCLUSION

For the reasons set forth above, the Court GRANTS in part defendants' motion to compel

arbitration and ORDERS Translarity and Grand Junction to engage in arbitration in Singapore pursuant to the SPA. Translarity must also arbitrate its claims against Marassa and Wang to the extent those claims are based on actions that Marassa and Wang took as agents of Grand Junction.

The Court STAYS Translarity's non-arbitrable claims against Marassa, Wang and PGA,[14] as well as the balance of the action (Translarity's claims against ZiFund and Alpha) because those claims are intertwined with the arbitrable claims.

**IT IS SO ORDERED**.

Dated: October 29, 2024

_____
SUSAN ILLSTON
United States District Judge

---

[14] The facts are disputed as to whether this Court has personal jurisdiction over PGA, Wang and Marassa. After the stay is lifted and if litigation proceeds, defendants may renew their motion to dismiss for lack of personal jurisdiction and for failure to state a claim.